OPINION OF THE COURT
Linda S. Jamieson, J.
There are two motions to dismiss before the court, one filed by each defendant. Although the defendants are similarly situated, in that each is a company that provides working capital to businesses, using contracts that expressly state that they are “merchant agreements” and not loans, the forms that each company uses are different in one main respect, as will be discussed below.
Background
A brief summary of the relevant facts is necessary. Certain of the plaintiffs entered into three different agreements with Arch Capital Funding, LLC during 2015 and 2016. Pursuant to these agreements, Arch gave plaintiffs $166,000, and plaintiffs gave Arch future receivables worth $241,334. Each of these three agreements provided that Arch could take no more than 13 to 15% of that day’s receivables, or a set daily amount. The agreements state that payments made to Arch “shall be conditioned upon Merchant’s sale of products and services and the payment therefore by Merchant’s customers.” The agreements had no termination date, but provided for an automatically renewable one-year term (the evergreen provision).
The agreements all provide that Arch shall, upon plaintiffs’ request, “reconcile the Merchant’s account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant’s bank account so that the amount debited each month equals the Specified Percentage.” This is the “reconciliation provision.” The agreements also allow plaintiffs to request that the estimated daily amount be changed.
*811 Plaintiff Epazz, Inc. and defendant Cap Call, LLC entered into an agreement[1] dated February 2016 in which Cap Call gave Epazz $120,000 in exchange for future receivables of $179,880. The agreement provides, similarly to the Arch agreements, for Cap Call to take no more than 15% of the daily receipts, or a fixed daily amount of $1,635. The agreement provides that the receipts shall be “from settlement amounts which would otherwise be due to Merchant from electronic check transaction or other payment processing transactions.” The agreement also had an evergreen provision, just as the Arch agreements did. Although Cap Call argues that its agreement contains a reconciliation provision, a review of the language that it points to does not support this. As Cap Call states in its memorandum of law, the provision only provides that Cap Call can “view Epazz’s bank account ‘in order to calculate the amount of [Epazz’s] daily payment.’ ” Unlike the Arch agreements, it does not state that Epazz can seek to have the amount changed. Nor does it state that any overage or underpayment will be repaid to plaintiffs or taken from plaintiffs.
Plaintiffs breached the agreements on or about March 1, 2016, and commenced this action soon after.
Analysis
The amended complaint contains 12 causes of action. Three concern usury, and four concern Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USC § 1962). In sum, the claims are: (1) to vacate the judgments by confession because of usury “and other wrongful conduct”; (2) to obtain a judgment against defendants because of usury, and to vacate the agreements; (3) to obtain a judgment based on the overcharge of interest; (4) damages for the violation of the Licensed Lender Law (Banking Law § 340); (5) damages arising under RICO, subsection (a); (6) damages arising under RICO, subsection (b); (7) damages arising under RICO, subsection (c); (8) damages arising under RICO, subsection (d); (9) to obtain a judgment rescinding the agreements; (10) damages for fraudulent inducement; (11) damages for unconscionability; and (12) damages for prima facie tort.
Arch argues that certain of the claims—the first, second, ninth and eleventh—all must be dismissed out of hand because *812 they are not actionable claims under New York law. Beginning with the first, to vacate the confessions of judgment because of usury, the court cannot agree with Arch that there is no such cause of action. Rather, all of the cases cited by Arch allow for such relief upon a plenary action—which plaintiffs have commenced. (See e.g. Malhado v Cordani, 153 AD2d 673, 673 [2d Dept 1989] [“A person seeking to vacate a confession of judgment and judgment entered thereon must commence a plenary action for that relief”]; L.R. Dean, Inc. v International Energy Resources, 213 AD2d 455, 456 [2d Dept 1995] [“The general rule is that a party seeking to set aside an affidavit of confession of judgment and to vacate a judgment entered thereon must commence a plenary action for that relief”].) The first cause of action cannot thus be dismissed on this basis. However, this claim is addressed in detail below.
Next, the ninth cause of action seeks rescission based on misrepresentations or unilateral mistake. Putting aside whether rescission can be pleaded as a claim or not, there are no facts alleged that would support a claim based on misrepresentations or unilateral mistake. Plaintiffs claim that defendants misled them by representing that they were entering into “loans governed by usury laws,” but instead caused them “to enter into ‘merchant agreements.’ ”[2] They state that they would, not have knowingly entered into merchant agreements, because what they really wanted were loans. Indeed, plaintiffs allege that “the word ‘purchase’ or ‘sale’ would have caused Passley to decline a transaction with [defendants] because a loan—the product Passley wanted to obtain—is not a purchase or sale.”
A review of the contracts in this action shows that not only do they all clearly state that they involve purchases or sales, but they all expressly state that they are not loans. Even if someone were confused by the contracts, or did not understand the obligation or the process, by reading the documents, one would grasp immediately that they certainly were not straightforward loans. The very first heading on the page was “Merchant Agreement,” and the second heading says “Purchase and Sale of Future Receivables.” (This is the third heading on the Cap Call agreement, with the second reading “Merchant Information.”)
*813 For plaintiffs to state that they would not have entered into a purchase or sale if they had known that that is what they were doing is utterly undermined by the documents themselves. As the Second Department has held, in Karsanow v Kuehlewein (232 AD2d 458, 459 [2d Dept 1996]),
“the subject provision was clearly set out in the . . . agreements, and where a party has the means available to him of knowing by the exercise of ordinary intelligence the truth or real quality of the subject of the representation, he must make use of those means or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.” (Internal quotation marks omitted.)
So too here, plaintiffs had the means to understand that the agreements set forth that they were not loans. As it has long been settled that a party is bound by that which it signs, the court finds that the ninth cause of action, for rescission based on misrepresentation or mistake, and the tenth cause of action, for fraudulent inducement based on misrepresentation, must be dismissed as a matter of law. (Pimpinello v Swift & Co., 253 NY 159, 162-163 [1930] [“(T)he signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby. That his mind never gave assent to the terms expressed is not material. If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him” (citation omitted)].)
As for the eleventh cause of action, which seeks judgment voiding the merchant agreements because of unconscionability, defendants state, without contradiction, that unconscionability is not a claim, but a defense. The court agrees.
“The concept of unconscionability . . . does not create a new cause of action to recover damages . . . but, rather, provides a defense for a party opposing enforcement of a contract or a cause of action for rescission of a contract. Thus, the plaintiffs’ causes of action founded upon unconscionability do not set forth cognizable claims and should have been dismissed.” (Bevilacque v Ford Motor Co., 125 AD2d 516, 519 [2d Dept 1986]; see also Lewis v Hertz Corp., 181 AD2d 493, 495 [1st Dept 1992].)
The eleventh cause of action is thus dismissed.
The twelfth cause of action seeks damages for prima facie tort as an “alternative” cause of action.
*814 “Prima facie tort affords a remedy for the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or a series of acts which would otherwise be lawful. The requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful.” (Freihofer v Hearst Corp., 65 NY2d 135, 142-143 [1985] [internal quotation marks and citations omitted].)
Indeed, “there is no recovery in prima facie tort unless malevolence is the sole motive for defendant’s otherwise lawful act or, in Justice Holmes’ characteristically colorful language, unless defendant acts from ‘disinterested malevolence.’ ” (Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314, 333 [1983] [emphasis added].)
Here, it is quite clear, from reviewing all of plaintiffs’ papers, that defendants’ sole motivation was profit (or greed, as plaintiffs would have it). According to plaintiffs’ papers, defendants did not care one whit about plaintiffs, other than to view them as “cash cows.” There is no “disinterested malevolence,” the basis for a claim of prima facie tort, and, accordingly, the twelfth cause of action is dismissed.
The fourth cause of action seeks damages based on defendants’ alleged violation of Licensed Lender Law (Banking Law § 340).[3] A review of this statute shows that it only applies to loans made to individuals. Even assuming that the transac *815 tions here were loans, none were made to individuals. Plaintiffs’ reliance on the section of the statute that states that it covers loans “in a principal amount of fifty thousand dollars or less for business and commercial loans” ignores the second paragraph, which limits the applicability to companies that engage in the business of making loans to individuals. (Banking Law § 340.) As plaintiffs have failed to allege that defendants are in the business of making loans to individuals, this cause of action must be dismissed.
Turning next to the usury claims, the second cause of action seeks judgment against defendants based on usury. It has long been settled in this state that criminal usury may only be asserted as a defense by a corporation, and never as a means to seek affirmative relief.[4]
“While the statute expressly prohibits only the interposition of usury as a defense, this court has employed the principle that a party may not accomplish by indirection what is directly forbidden to it and has accorded the rule a broader scope. Thus, it is well established that the statute generally proscribes a corporation from using the usury laws either as a defense to payment of an obligation or, affirmatively, to set aside an agreement and recover the usurious premium. The statutory exception for interest exceeding 25 percent per annum is strictly an affirmative defense to an action seeking repayment of a loan and may not, as attempted here, be employed as a means to effect recovery by the corporate borrower.” (Intima-Eighteen, Inc. v Schreiber Co., 172 AD2d 456, 457-458 [1st Dept 1991] [internal quotation marks and citations omitted].)
The court must thus dismiss the second cause of action.
The third cause of action, which seeks judgment “based on an overcharge of interest” and to void the agreements, is nothing more than another way of pleading usury as a form of affirmative relief. Plaintiffs actually acknowledge this, stating that “a usury claim falls within the meaning of overcharge of interest.” Thus, this claim must also be dismissed.
 The first cause of action, and the RICO claims, turn on whether or not the agreements are usurious. In order to *816 determine that, the court must first determine whether the contracts are loans or not. “Usury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be.” (Seidel v 18 E. 17th St. Owners, 79 NY2d 735, 744 [1992] [internal quotation marks and citations omitted].)
In New York, there is a presumption that a transaction is not usurious. As a result, claims of usury must be proved by clear and convincing evidence, a much higher standard than the usual preponderance. (Giventer v Arnow, 37 NY2d 305, 309 [1975].) In determining whether a transaction is a loan or not, the court must examine whether or not defendant is absolutely entitled to repayment under all circumstances. “For a true loan it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard.” (Rubenstein v Small, 273 App Div 102, 104 [1st Dept 1947].)
Many trial courts have examined similar agreements in the last several years, and have largely determined that most of them are not loans, but purchases of receivables. (See e.g. Merchant Cash & Capital, LLC v Yehowa Med. Servs., Inc., 2016 NY Slip Op 31590[U], *5 [Sup Ct, Nassau County, July 29, 2016] [“Under the terms of the subject Agreement, if Seller/ Defendant produces no daily revenue, no payments are required, and there is no absolute obligation of repayment. While the terms of payment provided for in the Agreement may be onerous, they do not involve a loan or forbearance of money, and are unaffected by civil or criminal usury statutes”]; Professional Merchant Advance Capital, LLC v Your Trading Room, LLC, 2012 NY Slip Op 33785 [U], *6 [Sup Ct, Suffolk County, Nov. 28, 2012] [“Upon review of the record adduced on this motion, the court finds that Waryn failed to establish that the subject agreement to purchase credit card receivables was a loan and not an agreement to purchase future receivables for a lump sum discounted purchase price payable in advance by the plaintiff in exchange for a contingent return”].)
The very recent case of IBIS Capital Group, LLC v Four Paws Orlando LLC (2017 NY Slip Op 30477[U] [Sup Ct, Nassau County, Mar. 10, 2017]) reviewed many of these cases. Reading through all of them, it is clear that there are certain factors that a court should look for to see if repayment is absolute or contingent. The first, and the one cited by each and every court that found that the transaction was not a loan, is whether or not there is a reconciliation provision in the agree *817 ment. The reconciliation provisions allow the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less, and will receive a refund of anything taken by the company exceeding the specified percentage (which often can also be adjusted downward). If the merchant is doing well, it will pay more than the daily amount to reach the specified percentage. (See e.g. Retail Capital, LLC v Spice Intentions Inc., 2016 NY Slip Op 32614[U], *2 [Sup Ct, Queens County, Jan. 3, 2017] [not a loan when “(t)he agreement provided a reconciliation on demand provision whereby the parties (were each) permitted to demand the monthly reconciliation of funds from the other to ensure that neither entity collected more or less of the sales proceeds than they were contractually entitled to collect from the designated bank account”].)
If there is no reconciliation provision, the agreement may be considered a loan. (See Professional Merchant Advance Capital, LLC v C Care Servs., LLC, 2015 WL 4392081, *4, 2015 US Dist LEXIS 92035, *13 [SD NY, July 15, 2015, No. 13-cv-6562(RJS)] [agreement obligated merchant “to make a minimum weekly payment irrespective of (the) accounts receivable,” such that it was a loan]; Merchant Funding Servs., LLC v Volunteer Pharm. Inc., 55 Misc 3d 316, 318 [Sup Ct, Westchester County 2016].) In this action, the Arch agreements all provide for reconciliation. The Cap Call agreement, in contrast, does not, as discussed above in the background section.
The next provision that is deemed quintessential is whether the agreement has a finite term or not. If the term is indefinite, then it “is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.” (IBIS Capital Group, LLC v Four Paws Orlando LLC, 2017 NY Slip Op 30477 [U], *5 [Sup Ct, Nassau County, Mar. 10, 2017].) This is because defendants’ “collection of sales proceeds is contingent upon [plaintiffs] actually generating sales and those sales actually resulting in the collection of revenue.” (Id.) Indeed,
“neither party could have known when the Agreement might end because [defendants’] collection of sales proceeds was wholly contingent upon the outside factor of customers actually . . . paying for products and services. The existence of this uncertainty in the length of the Agreement is an express recognition by the parties of the wholly contingent *818 nature of this Agreement.” (Id. at *5-6; see also Merchant Cash & Capital, 2016 NY Slip Op 31590[U], *4 [“the period over which such payment would take place was indeterminate”]; Chartrock v National Bank of Cal., Sup Ct, Queens County, Jan. 17, 2017, index No. 708688/2016, slip op at 2 [same]; Platinum Rapid Funding Group Ltd. v VIP Limousine Servs., Inc., 2016 NY Slip Op 32745[U] [Sup Ct, Nassau County, June 8, 2016].)
All of the agreements here have this provision.
The final factor, cited in IBIS, is whether the defendant has any recourse should the merchant declare bankruptcy. The IBIS agreement provides that if the merchant declares bankruptcy, it will not be a breach, nor will it obligate the guarantors to pay. This is a much more forgiving provision, not present in any of the agreements in the instant action. It is virtually impossible to read the Cap Call agreement, but it does appear that section 3.1 states that bankruptcy is a basis for declaring a default. The Arch agreement does not state that bankruptcy is a basis for a default, but it does state that should the merchant file for bankruptcy, the personal guaranty may be enforced, and Arch may file the confession of judgment. This factor thus weighs against defendants.
Having weighed all of the factors, the court finds that the Arch agreements are sufficiently risky such that they cannot be considered loans, as a matter of law. Under no circumstances could Arch be assured of repayment, because its agreements are contingent on a merchant’s success, and the term is indefinite. Accordingly, the court dismisses the usury claims against Arch in their entirety. Not only does this dismiss the first cause of action as to Arch, but it also dismisses the fifth, sixth, seventh and eighth causes of action and the RICO claims, as to Arch. The court notes that RICO claims have “a heightened pleading requirement because such assertion has been found to be an unusually potent weapon—the litigation equivalent of a thermonuclear device.” (Besicorp, Ltd. v Kahn, 290 AD2d 147, 151 [3d Dept 2002] [internal quotation marks and citation omitted].)
Each of these RICO claims requires that a defendant do one of two things: either (1) have collected an unlawful debt; or (2) engaged in a pattern of racketeering activity. (See 18 USC § 1962 [a] [“It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an un *819 lawful debt”].) Since the court has already determined that Arch did not collect an unlawful debt, it can only be liable under RICO if it engaged in a pattern of racketeering activity. According to plaintiffs, in order to constitute a pattern of racketeering activity, there must be activity of a continuing nature. Indeed,
“[i]n order to sustain a civil RICO claim, a party is required to allege that the multiple predicates constitute a pattern of racketeering activity. Further, to allege a pattern of racketeering activity, a party must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.” (New York Mtge. Servicing Corp. v Dake, 179 AD2d 1007, 1007 [4th Dept 1992] [internal quotation marks and citation omitted].)
Plaintiffs allege that this activity consisted of Arch and Cap Call, “through its [sic] representatives, engaging] in more than two loan misrepresentations, whether through loan-only emails or verbally.” The court has already found that there were no actionable misrepresentations, as set forth above (supra at 813). Nor are there any other allegations that can constitute a “pattern of racketeering.” The court thus dismisses all of the RICO claims as to Arch, and all of the RICO claims alleging a “pattern of racketeering activity” as to Cap Call.
However, the same finding of “non-loan” does not necessarily hold true for the Cap Call agreement. The Cap Call agreement appears to remove much of the risk from the calculation, by omitting the reconciliation provision from the agreement. The court thus cannot find, as a matter of law, that the Cap Call transaction is not a loan. As a result, the court cannot grant Cap Call’s motion to dismiss the first cause of action.
To the extent that the fifth, sixth, seventh and eighth causes of action seek damages based on the alleged collection of an “unlawful debt,” they are not dismissed because the court has not determined that the transaction was not a loan. Should the court ultimately determine that the Cap Call transaction was, in fact, a loan and was usurious, these claims may be valid.

. The agreement is nearly illegible. Cap Call should have at least attached a blank exact duplicate so that the court could have read it more easily.

. Plaintiffs fail to identify specifically how every one of these alleged misrepresentations can be attributed to each defendant. Instead, plaintiffs allege, without any detail, that the person making the alleged misrepresentation is somehow “affiliated” with a defendant.

. This section provides, in relevant part, that
“[n]o person or other entity shall engage in the business of making loans in the principal amount of twenty-five thousand dollars or less for any loan to an individual . . . and in a principal amount of fifty thousand dollars or less for business and commercial loans, and charge ... a greater rate of interest than the lender would be permitted by law to charge if he were not a licensee, . . .
“For the purposes of this section, a person or entity shall be considered as engaging in the business of making loans in New York . . . if it solicits loans in the amounts prescribed by this section within this state and, in connection with such solicitation, makes loans to individuals then resident in this state, except that no person or entity shall be considered as engaging in the business of making loans in this state on the basis of isolated, incidental or occasional transactions which otherwise meet the requirements of this section.” (Banking Law § 340 [emphasis added].)

. The court is puzzled by plaintiffs’ assertion, at section VII of their memorandum of law, that usury is an affirmative claim since it is black-letter law in this state that corporations may not use it affirmatively.